1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   EDWARD S. KENNEDY,                              No. C 04-4342 WHA (PR)

11                  Petitioner,                      **DENIAL OF PETITION FOR WRIT
                                                     OF HABEAS CORPUS**
12       vs.

13   MIKE KNOWLES, Warden,

14                  Respondent.
                                            /
15

16       This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. 2254.  The

17   court ordered respondent to show cause why the writ should not be granted.  Respondent has

18   filed an answer and a memorandum of points and authorities in support of it, and has lodged

19   exhibits with the court.  Although the time for him to do so was extended, petitioner has chosen

20   not to file a traverse.  For the reasons set forth below the petition is **DENIED**.

21                                     **STATEMENT**

22       A jury convicted petitioner of first degree murder.  He was sentenced to life without

23   parole.  His conviction was affirmed on direct appeal by the California Court of Appeal, and the

24   California Supreme Court denied review.

25       As grounds for habeas relief he asserts that: (1) his lawyer had a conflict of interest; (2)

26   his rights under the Confrontation Clause of the Sixth Amendment were violated by admission

27   of out-of-court statements; and (3) counsel was ineffective in challenging DNA evidence.

28   ///

**United States District Court**
For the Northern District of California

**United States District Court**

For the Northern District of California

1    Petitioner does not dispute the following facts, which are taken from the opinion of the

2   California Court of Appeal.

3        In 1996, Beatrice Kennedy lived at 1444 47th Avenue in San Francisco
     with her sons Emmett Kennedy and appellant.  At that time Beatrice was 80
4    years old, Emmett was 56, and appellant was 40 years old.  Appellant lived
     upstairs with his mother, and Emmett had an apartment downstairs in the rear
5    portion of the garage.

6        Beatrice and Emmett jointly owned a green Buick with a leather interior,
     and they had the only keys to the car.  The car was usually driven by Emmett.
7    Appellant drove very little because he had a bad leg.

8        The victim, Sergio Crockett, a 100-pound boy who was 5 feet and 1 inch
     tall, was a drug dealer who "hung out" with Dion Ruggs, James Sullivan, and
9    others on the corner of 46th Avenue and Judah, selling crack cocaine.   [FN2.
     Although the record does not contain Crockett's age, the medical examiner
10   described him as pre-pubescent.]  This corner was a block and a half from
     appellant's home.  Appellant and his brother Emmett were frequent customers,
11   and appellant bought on credit.  Dion Ruggs testified that he was with Crockett
     the night before he was killed.  Crockett saw appellant and went over to talk with
12   him.  They were having a heated argument by the time Ruggs joined them.  The
     argument was about money.  Crockett said appellant owed him $40, and
13   appellant said it was his brother who owed the money.  Appellant admitted to
     Ruggs that he had told Crockett he would pay his brother's debt.  Appellant then
14   told Crockett to come to his house the next night, and he would pay him.

15       James Sullivan testified that he used to sell drugs with Crockett at 46th
     and Judah.  He sold crack cocaine to appellant a couple of times a week.
16   Sullivan said he would sometimes go to appellant's house to deliver the drugs
     and that he had cooked cocaine there a few times.  Sullivan was with Crockett
17   the night he was killed.  Crockett told him he had to go pick up some money
     from appellant at 9 p.m.

18

19       Emmett Kennedy asserted his Fifth Amendment privilege and refused to
     testify at trial.  His preliminary hearing testimony was therefore read to the jury.
20   At the preliminary hearing, Emmett testified that he and appellant were driving
     around the neighborhood on the afternoon of February 24, 1996, when they saw
21   Sergio Crockett.  Crockett said to appellant, "Hey, where is my money?"
     Appellant told Crockett to come by the house at 9 p.m. that night to collect.
22   Earlier, appellant had told Emmett he (appellant) owed Crockett $40 for drugs.

23       Emmett was in his apartment downstairs when Crockett arrived about 9
     p.m. that night.  After Crockett came into his apartment, he and Crockett walked
     to the garage where they saw appellant.  Emmett then returned to his apartment
24   to watch television.  The next thing Emmett knew, appellant and Crockett were
     back in his apartment, Crockett fell backward, and landed on Emmett's couch.
25   Appellant dove onto Crockett, reached over behind the couch, grabbed an
     eight-inch knife and stabbed Crockett in the shoulder.  When appellant tried to
26   stab Crockett again, Crockett grabbed the knife by the blade, and they struggled
     for possession of it, leaving a bloody smear on the couch.  As they struggled,
27   appellant kept asking, "Where is your dope?"  Crockett said he had drugs stashed
     around the corner at the bottom of the dumpster.  Emmett said appellant told him

28

2

**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

that if Emmett went and got the drugs, appellant would not stab Crockett again.

Emmett went to the dumpster and found it full of garbage, so he did not look through it. Emmett returned home and asked Crockett to tell him exactly where the dope was. Crockett explained it was underneath the right side of the dumpster. Emmett went back to the dumpster and still could not find anything. He returned and found that appellant had pulled Crockett's pants down and tied his feet with one of Emmett's amplifier cords. Appellant sent Emmett to look for the stash a third time, but he still did not find it. Emmett asked appellant to take Crockett to the hospital.

Emmett, appellant, and Crockett went to the garage and got into the car. Emmett was driving, Crockett was in the middle of the front seat, and appellant was in the front passenger's seat. Appellant agreed they would take Crockett to the hospital after they retrieved the drug stash. As they were driving, appellant stabbed Crockett in the arm with the knife. When they arrived at the dumpster, Crockett got out, reached up under the dumpster and retrieved a bag. Instead of going to the hospital as promised, appellant directed Emmett to drive back to their house. There, all three of them got out of the car, and appellant took Crockett back to Emmett's apartment where appellant started smoking the crack cocaine he had just taken.

Emmett testified he again told appellant to take Crockett to the hospital. He, Crockett, and appellant again got in the car and started to drive to the University of California Hospital. Appellant told Emmett to drive to French Hospital instead because the police would be at the University of California hospital. As they were driving, appellant announced that Crockett was dead. Emmett turned and saw appellant holding a knife to Crockett's throat. Crockett's head was hanging down and his eyes were closed. Crockett then came to life, saying the knife was stuck in him. Appellant responded by "wailing with the knife," stabbing Crockett repeatedly.

Emmett felt Crockett's body convulse and then die. He started yelling at appellant to get Crockett out of the car. Emmett stopped the car, and appellant pulled Crockett out of the car, leaving his body on the street. Appellant told Emmett to drive him to Stow Lake in Golden Gate Park. Emmett somehow ended up at a different lake near 36th Avenue where appellant tossed the knife into the lake.

When they returned home, Emmett removed his bloody clothing and took a shower. While Emmett was showering, appellant took Emmett's bloody clothes and drove off in the car, returning about 20 minutes later. When appellant returned, he suggested they go spend the night at a motel in Berkeley, which they did. The next morning appellant drove off in the car. Emmett stayed in the motel for two days, but then he began getting sick and vomiting. When Emmett returned home, he found that appellant had taken all of his furniture and the rug out of his apartment, and put all of his clothes upstairs.

Emmett went to the Veteran's Administration hospital two days after the incident because he was so upset, vomiting blood, and shaking. He saw a physician and a psychiatrist. When they asked what was bothering him, Emmett told them he had been a held hostage during a murder.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     Mary Ellen Smith, a psychiatric technician at the Veteran's Administration hospital testified that Emmett told her appellant had stabbed a drug dealer numerous times while demanding to know where his drugs were. [FN3. She was known as Mary Ellen Briggs in 1996, and is sometimes referred to as Briggs in the record. Smith is her married name.] He told her that after the dealer said the drugs were out behind a dumpster, either he or appellant stayed with the dealer while the other went to the dumpster to find the drugs. After that, they put the dealer in the car to take him to the hospital. Emmett told Smith that as they were driving through Golden Gate Park, the dealer's head was resting on Emmett's shoulder and he said, "Please don't let him kill me, help me." Emmett then heard the "knife hit bone." Emmett told Smith they put the drug dealer on the street. Emmett said he participated because he was afraid if he didn't, his brother would kill him. Emmett said he couldn't sleep because he kept hearing the victim's voice in his head.

     Darwish Dajani testified that Emmett came into his store in February 1997 (a year after the killing) in a distraught condition. He said his brother held him and a kid hostage. Emmett saw his brother stab the kid twice in the garage. Emmett told Dajani they got into the car to take the kid to the University of California Hospital but then decided to go to Kaiser instead. Dajani testified that Emmett told him that while they were in the car, appellant stabbed the kid again. Emmett told Dajani that when they saw the kid had died, they dumped his body on Anza Street.

     Terry Rhodes, moved into Emmett's apartment sometime in late 1995 or early 1996. Rhodes testified that Crockett came to the house to sell drugs. She recalled several disagreements about drugs and money for drugs between Crockett and Emmett. After Crockett had left following a dispute, Emmett had said "he would take all of their dope and fuck them.... He would make a little punk out of them." Rhodes left after this incident and returned about a week later. When she returned, she saw that all of the furniture had been removed from Emmett's apartment.

     Crockett's body was found in the street at the intersection of 12th Avenue and Anza Street around 11:20 p.m. on February 24, 1996, by San Francisco Police Officer Peter Ionin. A cord was wrapped around his ankles. Michael Gaynor, a San Francisco Police Inspector with expertise in bloodstains, examined bloodstains on Crockett's legs and concluded that his pants had been pulled down when drops of blood had fallen on them. He also found blood smeared inside the pants pockets, which would have occurred from someone with blood on his hands sticking them into Crockett's pockets. The large amount of blood on the thigh area suggested that Crockett had been in a sitting position when assaulted. The pattern of the blood on the pants was consistent with Crockett having been seated in the middle of the front seat and being stabbed by someone in the passenger seat.

     Dr. Jason Trent of the San Francisco Medical Examiner's Office, testified that Crockett had died of multiple stab wounds. A total of 46 stab wounds had been inflicted, 13 of which were defense wounds incurred as the victim attempted to ward off the blows. The wounds were consistent with having been inflicted by a butcher knife or a kitchen carving knife. The injuries indicate the victim was sitting and were consistent with having been inflicted by a person sitting to the victim's right.

4

United States District Court

For the Northern District of California

1

2          In May 1996, police inspector Gaynor and other officers examined the
Kennedy Buick for possible evidence.  He had been told the car may have been
3   used to transport the body, so he examined the seats, floorboard, and trunk for
possible blood and found none.  He did not, however, examine the headliner or
4   visor.  Gaynor examined the car a second time in February 1997 after Emmett
gave his statements to the police.  This time he was asked to examine the upper
5   portion of the car as well.  Using luminal and paying extra attention to the upper
part of the car, Gaynor found indications of blood spots on the passenger's visor
6   and headliner.  Gaynor cut out the headliner and the visor and sent them to the
crime lab.

7          Alan Keel, a criminalist and DNA analyst in the San Francisco crime
laboratory, found tiny blood spots on both the visor and the headliner.  They
8   were sitting on the surface of the fabric, which indicated that they were blood
spatters.  Keel performed DNA testing and analysis on these blood spots using
9   DQ-alpha, polymarkers, and D1S80 methods, comparing them to a blood sample
from Crockett's body.  The testing revealed the following: (a) using DQ-alpha,
10  Crockett's blood was 2-2 and the visor spot was 2-2; (b) using polymarkers, at
the LDLR locus Crockett's blood was B-B and the visor spot was B-B, at the
11  GYPA locus Crockett's blood was A-B and the visor spot was A-B, at the HBGG
locus Crockett's blood was A-B and the visor spot was A-B, at the D7S8 locus
12  Crockett's blood was B-B and the visor spot was B-B, and at the GC locus
Crockett's blood was 18-31 and the visor spot was 18-31; and (c) using D1S80,
13  Crockett's blood was 18-31 and the visor spot was 18-31.  Using population
databases for these loci, Keel made calculations of the allele frequency and
14  determined that the combination was common to 1 in 750,000 Caucasians, 1 in
4,200,000 African-Americans, 1 in 2,500,000 Mexican-Americans, and 1 in
15  1,500,000 Asians.

16         Keel acknowledged on cross-examination that he had not tested blood
samples from either of the Kennedy brothers, so they could not be eliminated as
17  a source of the blood spots.  Keel admitted that under current industry guidelines
he was not qualified to act in his capacity as technical leader of the laboratory
18  because of his lack of an advanced degree.  There was, however, a waiver
provision for which he had applied.  Keel noted that he was still qualified to do
19  DNA analysis under these guidelines.  Keel also acknowledged that his
laboratory once had a problem with the water supply used in PCR testing, but it
20  did not occur until months after he had already run the tests in this case.

21  (Exh. 8 at 2-8)[1]

22                          **DISCUSSION**

23  **A.    STANDARD OF REVIEW**

24         A district court may not grant a petition challenging a state conviction or sentence on the

25  basis of a claim that was reviewed on the merits in state court unless the state court's

26  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

27  _____

28         [1] Citations to "exh." are to the exhibits constituting the record lodged with the court
by the Attorney General, unless otherwise indicated.

United States District Court

For the Northern District of California

1  unreasonable application of, clearly established Federal law, as determined by the Supreme

2  Court of the United States; or (2) resulted in a decision that was based on an unreasonable

3  determination of the facts in light of the evidence presented in the State court proceeding." 28

4  U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of

5  law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong

6  applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340

7  (2003).

8      A state court decision is "contrary to" Supreme Court authority, that is, falls under the

9  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

10  reached by [the Supreme] Court on a question of law or if the state court decides a case

11  differently than [the Supreme] Court has on a set of materially indistinguishable facts."

12  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of"

13  Supreme Court authority, falls under the second clause of § 2254(d)(1), if it correctly identifies

14  the governing legal principle from the Supreme Court's decisions but "unreasonably applies

15  that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas

16  review may not issue the writ "simply because that court concludes in its independent judgment

17  that the relevant state-court decision applied clearly established federal law erroneously or

18  incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support

19  granting the writ. *See id.* at 409.

20      "Factual determinations by state courts are presumed correct absent clear and

21  convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340.  This presumption is not

22  altered by the fact that the finding was made by a state court of appeals, rather than by a state

23  trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082,

24  1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).  A petitioner must present clear and

25  convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory

26  assertions will not do. *Id.*

27      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

28  will not be overturned on factual grounds unless objectively unreasonable in light of the

United States District Court

For the Northern District of California

1   evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres*

2   *v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

3          When there is no reasoned opinion from the highest state court to consider the

4   petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501

5   U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

6   **B.**     **ISSUES PRESENTED**

7          **1.**     **Conflict of Interest**

8          Petitioner contends that his defense attorney, Bill Fazio, had a conflict of interest

9   because he was considering running or had decided to run for district attorney.  The California

10  Court of Appeal rejected this claim, concluding that there was no "actual conflict."  (Exh. 8 at

11  9-12)

12         Petitioner did not raise this argument at trial.  In order to establish a violation of the

13  Sixth Amendment, a petitioner "who raised no objection at trial must demonstrate that an actual

14  conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S.

15  335, 348 (1980) (footnote omitted); *accord Mickens v. Taylor*, 535 U.S. 162, 171 (2002).  An

16  "actual conflict" is not separate from an "adverse effect;" rather, it is defined as one which

17  adversely affects the lawyer's performance. *Earp v. Ornoski*, 431 F.3d 1158, 1183 (9th Cir.

18  2005) (quoting *Mickens*, 535 U.S. at 172 n.5).

19         In order to establish that a conflict of interest "adversely affected counsel's

20  performance," petitioner must demonstrate that conflict of interest "actually affected" the

21  attorney's performance. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), a*mended*, 253 F.3d

22  1150 (9th Cir. 2001).  This showing need not rise to the level of actual prejudice, as it must with

23  an ineffective assistance claim based on counsel's incompetence. *Maiden v. Bunnell*, 35 F.3d

24  477, 481 (9th Cir. 1994).

25         An adverse effect in the *Cuyler* sense "must be one that significantly worsens counsel's

26  representation of the client before the court or in negotiations with the government." *United*

27  *States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995).  A conflict which causes problems of some

28  sort in some facet of the attorney-client relationship (for example, by generating transient

7

1    feelings of mistrust between attorney and client), but which ultimately has no significant impact

2    on counsel's representation before the court or in negotiations with the government, does not

3    cause an adverse effect in the sense of *Cuyler*. *Id.* at 1535-36.  A petitioner must prove an

4    actual conflict through a factual showing in the record.  *Bragg*, 242 F.3d at 1087

5        This is not a difficult claim to resolve, because petitioner simply has not met his burden

6    to show an "actual conflict," i.e., some effect on counsel's conduct of the case arising from his

7    putative run for district attorney.  He provides nothing but speculation (Pet. at Exh. C).

8        Because petitioner has not established that his Sixth Amendment rights were violated,

9    the rejection of this claim by the state appellate courts could not have been contrary to, or an

10   unreasonable application of, clearly-established Supreme Court authority.

11       **2.  Confrontation Clause Claim**

12       This issue originally was issue three in the petition.  In the "grounds" section of the form

13   petition, petitioner describes this issue thus:  "The judgment must be reversed because it is

14   based on inadmissible hearsay evidence."  (Pet. 8)  The facts he alleges in support are:

15   "Petitioner will be supplementing this claim with argument from direct appeal.  (See Exhibit

16   'D')."

17       Exhibit D consists of five pages from the petition for review filed in the direct appeal.

18   There counsel raised two distinct issues; one a claim that Emmett's preliminary hearing

19   testimony should not have been admitted because it was hearsay and because its admission

20   violated petitioner's Confrontation Clause rights; and the other that two witnesses' testimony as

21   to what Emmett had said to them was hearsay and should not have been admitted as prior

22   consistent statements.

23       Because this exhibit contained a Confrontation Clause claim the Court did not dismiss

24   the claim on initial review.  As to the second half of this claim, however, there is no federal

25   constitutional claim.  Petitioner therefore has not stated a ground for federal habeas relief as to

26   admission of the so-called prior consistent statements.  In addition, because the petition for

27   review was the medium by which petitioner presented his claims to the highest state court

28   available, the California Supreme Court, he has not exhausted any federal claim that might be

United States District Court
For the Northern District of California

8

1   hypothesized from these facts.

2       In conclusion, because petitioner does not contend that his federal rights were violated

3   in connection with the prior consistent statements, the Court will not address this issue further.

4   To extent petition intended to present it as a separate claim in this proceeding, it is **DISMISSED**

5   as presenting only a state-law claim.

6       Petitioner does contend that his constitutional rights were violated as to admission of

7   Emmett's preliminary hearing testimony.  At trial, Emmett invoked his Fifth Amendment rights

8   and refused to testify.  The trial court determined that he was "unavailable" and admitted his

9   testimony from the preliminary hearing (Exh. 8 at 12).  Petitioner contends that his rights under

10  the Confrontation Clause of the Sixth Amendment were violated by admission the preliminary

11  hearing testimony.

12      Confrontation Clause analysis has been dramatically changed by the Supreme Court's

13  decision in *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  *Crawford*, however, announced a

14  "new rule" for purposes of *Teague* analysis, and that rule does not come within the exception to

15  the *Teague* non-retroactivity rule for "watershed rules."  *Whorton v. Bockting*, 127 S. Ct. 1173,

16  1184 (2007) (applying *Teague v. Lane*, 489 U.S. 288, 310-316 (1989)).  *Crawford* therefore

17  does not apply retroactively on collateral attack.  *Id.*  Because this case was final before the

18  decision in *Crawford*, pre-*Crawford* law applies.

19      Before *Crawford*, "[A]n out-of-court statement against a criminal defendant was

20  admissible at trial if two conditions were met.  *See* [*Ohio v.*] *Roberts*, 448 U.S. [56,] [] 65-66.

21  First, 'in order to introduce relevant statements at trial, state prosecutors [must] either produce

22  the declarants of those statements as witnesses at trial or demonstrate their unavailability.'

23  [Citations.]  Second, even if prosecutors succeed in demonstrating unavailability, the statements

24  are only admissible if they bear 'adequate indicia of reliability.'  The 'indicia of reliability'

25  requirement is met if the statement fall within a 'firmly rooted hearsay exception' or contain

26  'particularized guarantees of trustworthiness.'"  *Bockting v. Bayer*, 505 F.3d 973, 978 (9th Cir.

27  2007).

28  ///

United States District Court
For the Northern District of California

9

1    Assertion of the Fifth Amendment privilege against self-incrimination by a witness, thus

2    preventing cross-examination, constitutes unavailability of that witness.  *See California v.*

3    *Green*, 399 U.S. 149, 167 (1970).  Prior preliminary hearing testimony may be deemed reliable

4    for admission if the declarant becomes unavailable to testify.  *Id.*

5    Although petitioner contends that the opportunity to cross-examine at the preliminary

6    hearing was not adequate, as the court of appeal noted the direct examination of Emmett is

7    thirty-seven pages long in the transcript, whereas cross takes up seventy-nine pages, "followed

8    by five pages or redirect and four pages of recross." (Exh. 8 at 13.)  Petitioner has failed to

9    show that cross-examination was so limited as not to amount to an opportunity to cross-examine

10   within the meaning of *California v. Green.*

11   In view of *California v. Green*, it is clear that admission of Emmett's preliminary

12   hearing testimony did not violate the Confrontation Clause.  Petitioner's rights were not

13   violated.

14   Because petitioner's confrontation rights were not violated, the state courts' rejection of

15   this claim was not contrary to, or an unreasonable application of, clearly-established Supreme

16   Court authority.

17   **3.    Ineffective Assistance of Counsel**

18   Petitioner contends that his counsel was ineffective in his attempts to challenge the

19   DNA evidence.

20   In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

21   must show: first, that counsel's performance was deficient, i.e., that it fell below an "objective

22   standard of reasonableness" under prevailing professional norms.  *Strickland v. Washington*,

23   466 U.S. 668, 687–88 (1984).  Second, he must establish that he was prejudiced by counsel's

24   deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

25   unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A

26   reasonable probability is defined as a probability sufficient to undermine confidence in the

27   outcome.  *Ibid.*  Judicial scrutiny of counsel's performance must be highly deferential, and a

28   court must indulge a strong presumption that counsel's conduct falls within the wide range of

**United States District Court**
For the Northern District of California

10

United States District Court
For the Northern District of California

1 reasonable professional assistance. *Id.* at 689. A difference of opinion as to trial tactics does

2 not constitute denial of effective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.

3 1981), and tactical decisions are not ineffective assistance simply because in retrospect better

4 tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir.

5 1984).

6    Petitioner presents little argument, and no facts, in support of this claim (Pet. Exh. F).

7 As the court of appeal pointed out, however, counsel used the DNA evidence strategically by

8 arguing that the blood spatters, shown to be from the victim by DNA analysis, were in such a

9 pattern in the car as to suggest that the victim was stabbed by the driver (Emmett) rather than

10 petitioner (Exh. 8 at 31-32). In retrospect it may seem that better tactics might have been

11 available, but disagreement with tactical decisions like this does not establish ineffective

12 assistance. *See Bashor*, 730 F.2d at 1241. Given the "strong presumption" in favor of

13 effectiveness, *see Strickland*, 466 U.S. at 689, petitioner's non-existent showing is not sufficient

14 to prevail on this claim.

15    Because counsel was not ineffective, the state courts' rejection of this claim was not

16 contrary to, or an unreasonable application of, clearly-established Supreme Court authority.

17 **CONCLUSION**

18    The petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

19    **IT IS SO ORDERED.**

20

21 Dated: March   31  , 2008.

          WILLIAM ALSUP

22           UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28 G:\PRO-SE\WHA\HC.04\KENNEDY342.RUL.wpd